

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
NORFOLK SOUTHERN RAILWAY COMPANY,

       Plaintiff & Third-Party Defendant,

-against-

EMJAY ENVIRONMENTAL RECYCLING, LTD.,

       Defendant & Third-Party Plaintiff,

and

EMJAY ENVIRONMENTAL RECYCLING, LTD.,

       Cross-Claimant & Cross-claim Defendant,

-against-

NEW YORK & ATLANTIC RAILWAY,

       Cross-claim Defendant & Cross-Claimant,
------------------------------------------------------------------X

**F I L E D**
IN CLERK'S OFFICE
U S DISTRICT COURT E.D.N.Y

★  MAR 19 2012  ★

LONG ISLAND OFFICE

<u>MEMORANDUM & ORDER</u>
09-CV-1322 (TCP) (WDW)

PLATT, District Judge.

    Pending are four motions: (1) Emjay Environmental Recycling, Ltd.'s Motion to Dismiss Plaintiff's Complaint based on a lack of Subject Matter Jurisdiction; (2) Emjay's Motion for partial Summary Judgment; (3) New York & Atlantic Railway's Motion to Dismiss its claim against Emjay; and (4) New York & Atlantic Railway's Motion to Strike the Declaration of Michael Cholowsky. For the reasons discussed below, (1) Emjay's Motion to Dismiss is **GRANTED**, (2) Emjay's Motion for partial Summary Judgment is **DENIED**, without prejudice to renew; (3) New York & Atlantic Railway's Motion to Dismiss is **DENIED**, without prejudice to renew; and (4) New York & Atlantic Railway's Motion to Strike is **DENIED**, without prejudice to renew.

1

## BACKGROUND

### A. Parties

Norfolk Southern Railway Company ("Plaintiff") is a corporation organized in the Commonwealth of Virginia. Pl.'s Compl. ¶ 1, ECF No. 1. Emjay Environmental Recycling, Ltd. ("Defendant") is a corporation organized, with its principal place of business, in New York. *Id.* at ¶ 2. The third-party defendant, New York & Atlantic Railway ("NY&A"), is a Delaware corporation with its principal place of business in Glendale, New York. Answer to Countercl. & Third-Party Compl. ¶ 2, ECF No. 6 [hereinafter *TP Compl.*].

Plaintiff filed the present suit in this Court "pursuant to 28 U.S.C. § 1332(a) in that the matter in controversy exceeds the sum or value of $75,000 and is between entities organized under the laws of and residing in different states." Pl.'s Compl. ¶ 3. Defendant disputes the Court's subject matter jurisdiction. *See, e.g.*, Def.'s Mem. Supp. Mot. Dismiss 10, ECF No. 70.

### B. Underlying Facts and Claims

On January 1, 2006, Plaintiff, Defendant, and NY&A executed a Transportation Contract ("Contract"). *See* Def.'s Decl. Supp. Mot. Dismiss, Ex. F, ECF No. 72-8. The Contract stated: "NYA and [Plaintiff] are hereinafter jointly referred to as 'Railroad.'" Contract 1. The Contract regarded the transporting of construction and demolition debris ("the Debris") from Defendant's Brentwood, New York facility. *See, e.g.*, Pl.'s Compl. ¶ 5. The Contract required "Railroad [to] transport [the Debris]' from Defendant's facility to Ohio. Contract 1. The Contract required Defendant to provide a "Volume Guarantee" of at least 2,000 railcar loads per calendar year for the length of the Contract. *See id.* § 2; App. A. If Defendant failed to meet the Volume Guarantee, Defendant would be required to "pay *Railroad* as liquidated damages for carload

2

deficits, $500 per deficit car." *Id.* at § 4 (emphasis added).

As to the Debris' transportation, Defendant would tender the railcars to NY&A, "a 'short-line' railroad which operates solely on Long Island, New York, and operates tracks which can service [Defendant's] facility"; NY&A would transport "those railcars to a rail yard where the railcars [were] 'interchanged' with [Plaintiff]. [Plaintiff] then transport[ed] the railcars." Pl.'s Compl. ¶ 6. Besides Plaintiff and NY&A, two other railroad companies (New York and New Jersey Railroad as well as Ohio Railroad) took part in transporting Defendant's Debris. *See, e.g.*, Victor Test., 37:25-39:6, Sept. 28, 2011.

The parties waived the Volume Guarantee for 2006. Pl.'s Compl. ¶ 8. For 2007, Plaintiff claims Defendant "tendered a total of 1,003 railcar loads to [Plaintiff and NY&A], resulting in a [Volume Guarantee] shortfall of 997 railcar loads." Pl.'s Compl. ¶ 10. In 2008, Plaintiff claims Defendant did not tender any railcar loads, resulting in a Volume Guarantee shortfall of 2,000 railcar load for that calendar year. *Id.* at ¶ 11. Plaintiff anticipated, at the time of the filing of its Complaint in March 2009, that Defendant would continue to fail to meet its contractual obligations; Plaintiff contended, therefore, that the overall Volume Guarantee shortfall would be "6,997 railcar loads, which pursuant to [the Contract] will result in the accrual of liquidated damages in the amount of $3,498,500.00" *Id.* at ¶¶ 15-16.[1] Plaintiff seeks this amount in the first count of breach of contract, plus interest, costs, and attorney's fees. *Id.* at ¶¶ 21-23.

In 2007, Plaintiff claims Defendant failed to pay the contractual freight charges for 267 shipments, which totals $60,270.00. Pl.'s Compl. ¶ 17. Plaintiff seeks this amount in the second

---

1 The Court has not received any information from the parties to conclude that Plaintiff's anticipation was incorrect (*i.e.*, the Court assumes, for purposes of this Order, that Plaintiff still argues that Defendant's shortfall is 6,997 railcars.).

3

breach of contract claim, plus interest, costs, and attorney's fees. *Id.* at ¶¶ 24-26. For 2006-2007, Plaintiff contends "[Defendant] incurred $118,212.00 in railcar demurrage charges," which Defendant, allegedly, refuses to pay. *Id.* at ¶¶ 19-20. Plaintiff seeks this sum, plus interest, costs, and attorney's fees. *Id.* at ¶¶ 27-28.

In response, Defendant asserts counterclaims against Plaintiff. Defendant argues Plaintiff was required, under the terms of the Contract, "to provide a certain minimum number of railcars to [Defendant]" which Plaintiff failed to do. Def.'s Answer ¶¶ 45-46. As a result, Defendant was unable to provide the minimum required amount of the Debris. *Id.* at ¶ 47. "The resulting inability to transport sufficient amounts of [the Debris] caused [Defendant] to suffer damages resulting from the costs associated with storing [the Debris] . . . damages resulting from . . . securing and transitioning to substitute transportation . . . and severe and irreparable damages to its business" due to loss of customers. *Id.* Defendant filed a breach of contract counter-claim against Plaintiff for this alleged failure; Defendant seeks $5,500,000.00 for damages. *Id.* at ¶ 51.

In response to Defendant's counterclaim, Plaintiff filed a third-party complaint against NY&A. *TP Compl.* 4-6, ECF No. 6. "In accordance with the Contract, as well as interchange agreements and the rules and requirements of the Association of the American Railroads, NY&A agreed to provide [Plaintiff] with reasonable railcar interchange and transportation service." *Id.* at ¶ 7. Plaintiff argues that Defendant's claim "was the direct result of the acts or omission of NY&A, in breach of express and implied agreements with [Plaintiff], and/or its duties to provide transportation services upon reasonable request." *Id.* at ¶ 10. Plaintiff argues, therefore, that 'NY&A is liable to [Plaintiff] for any and all damages which may be awarded . . . on [Defendant's] counterclaim against Plaintiff." *Id.* at ¶ 11. Plaintiff's cross-claim against NY&A

4

and NY&A's counter-claim against Plaintiff (NY&A Answer, ECF No. 24) have been withdrawn pursuant to a voluntary stipulation between Plaintiff and NY&A. ECF No. 92.[2]

On October 5, 2009, Defendant filed an Amended Answer, which contained cross-claims against NY&A in addition to its counter-claims against Plaintiff. *See* ECF No. 19. In response, NY&A filed cross-claims against Defendant. *See* NY&A Answer. NY&A filed a Motion to Dismiss its cross-claims against Defendant. *See* ECF No. 96. Defendant opposes NY&A's motion because, Defendant asserts, (1) NY&A's cross-claim "is so intertwined with the facts and circumstances of this action that it must be resolved in this forum to prevent substantial prejudice to the parties" and (2) "dismissal is not sought in good faith, but rather is a misguided and collusive attempt by NY&A and [Plaintiff] to gain some sort of tactical advantage with respect to [Defendant's] motion to dismiss." Def.'s Resp. Opp'n NY&A Mot. Dismiss ¶¶ 4-5, ECF No. 97.

## ANALYSIS

### A. Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction

Defendant argues this Court lacks subject matter jurisdiction on two bases: (1) the Court must realign NY&A as a co-plaintiff and (2) Plaintiff and NY&A constituted a joint venture under the Contract. *See, e.g.*, Def.'s Second Suppl. Mem. Supp. Mot. Dismiss. Since NY&A is a New York-based business, either basis would mean the Court lacks subject matter jurisdiction as there would be no complete diversity.

Before the Court can determine the outcome of the underlying issues, the Court must

---

2 The Court is aware of Defendant's letter regarding the voluntary stipulation between Plaintiff and NY&A. *See* ECF No. 93. As the Court does not have subject matter jurisdiction over this case, the issues involved in the voluntary stipulation must be addressed in state court.

decide which state's substantive contract laws, New York or Virginia, should be used.

    i.    **Choice of Law**

    a.    **Standard**

In diversity jurisdiction cases, federal courts are to apply the laws of the State in which the federal case has been brought. *See generally Erie R.R. Co., v. Tompkins*, 304 U.S. 64 (1938)." 'The essence of diversity jurisdiction is that a federal court enforces State law.'" *National Equip. Rental, Ltd. v. Reagin*, 338 F.2d 759, 762 (2d Cir. 1964) (citing *Angel v. Bullington*, 330 U.S. 183, 191-92 (1947). "The federal court sitting in a diversity case should assume no more and no less jurisdiction than a state court would if the latter were presiding over the same matter." *Id.*

"[I]t is now the well-settled policy of the courts of this state to enforce contractual provisions for choice of law . . . ." *Steves & Sons, Inc. v. Pottish*, No. 39918-10, 2011 WL 1877620, at *2 (Table) (N.Y. Sup. Ct. May 11, 2011) (citing *National Union Fire Ins. Co. of Pittsburgh, Pa. v. Williams*, 637 N.Y.S.2d 36, 38-39 (N.Y. App. Div. 1996)). "Such clauses are prima facie valid, and they are enforced because they provide certainty and predictability in the resolution of disputes." *Id.* (citing *Williams*, 637 N.Y.S.2d at 38-39).[3]

    b.    **Virginia's Substantive Contract Law Controls**

---

3 The holding notes, additionally, that these clauses "are not to be set aside absent a strong showing by the resisting party that they are unreasonable, unjust, in contravention of public policy, invalid due to fraud or overreaching, or that a trial in the selected forum would be so gravely difficult that the opposing party would, for all practical purposes, be deprived of his day in court." *Steves & Sons, Inc.*, No. 39918–10, 2011 WL 1877620, at *2 (citing *Di Ruocco v. Flamingo Beach Hotel & Casino, Inc.*, 557 N.Y.S.2d 140, 141 (N.Y. App. Div. 1990)). No party to this suit argues the clause should be set aside.

By applying New York law to this dispute, the Court holds that the Contract's "choice-of-law" provision is enforceable. Virginia law governs, therefore, "the interpretation and performance of [the] Contract." Contract § 9.

As to contract interpretation, Virginia precedent holds:

> It is "the intent of the parties as expressed in the contract [that] controls." *Gayler v. Gayler*,[] 455 S.E.2d 278, 280 (Va. Ct. App. 1995). Where a contract is unambiguous, courts must give effect to the words used. *Stacy v. Stacy*,[] 669 S.E.2d 348, 351 (Va. Ct. App. 2008). We " 'are bound to say that the parties intended what the written instrument plainly declares.' " *Irwin v. Irwin*,[] 623 S.E.2d 438, 441 (2005) (quoting *Wilson v. Holyfield*,[] 313 S.E.2d 396, 398 (Va. 1984)).

*Myers v. Myers*, No. 1509-10-3, 2011 WL 780128, at *1 (Va. Ct. App. March 8, 2011).

### ii. Realignment of the Parties

As an initial matter, "jurisdiction may be raised at any time during the course of litigation." *Md. Cas. Co. v. W.R. Grace & Co.*, 23 F.3d 617, 621 (2d Cir. 1993) (citing Fed. R. Civ. P. 12(h)(3)). "The relevant focus for determining diversity is the parties' citizenship when suit is commenced." *Id.* at 622 (citing *Anderson v. Watt*, 138 U.S. 694, 702-03 (1891)).

#### a. Standard

> In *Indianapolis v. Chase [Nat'l] Bank*, 314 U.S. 63, 69[] (1941), the Supreme Court held that "diversity jurisdiction cannot be conferred upon the federal courts by the parties' own determination of who are plaintiffs and who are defendants." Rather, the federal courts have subject matter jurisdiction based on diversity of citizenship of the parties only if an "actual, substantial controversy" exists between citizens of different states. 314 U.S. at 69-70. If the parties to an action are not aligned according to their "real interests," then they must be realigned "to ensure that the case truly involves the kind of adversarial relationship constitutionally required in a case or controversy in the federal courts." 1 James W. Moore, *et al., Moore's Federal Practice* ¶ 0.74[1], at 771 (2d ed.1993) (quoted in [*Md. Cas.*] *Co.*[], 23 F.3d [at] 622[]). If realignment destroys diversity, then the court lacks subject matter jurisdiction over the action.

7

*Fed. Ins. Co. v. Safeskin Corp.*, No. 98 Civ. 2194, 1998 WL 832706, at *1 (S.D.N.Y. Nov. 25, 1998).

"'It was, undoubtedly, the duty of the court in determining whether there was the requisite diversity of citizenship, to arrange the parties with respect to the actual controversy, looking beyond the formal arrangement made by the [complaint].'" *State Farm Mut. Auto. Ins. Co v. Hugee*, 115 F.2d 298, 301 (quoting *Helm v. Zarecor*, 222 U.S. 32, 32 S.Ct. 10, 12 (1911)); *see also Md. Cas. Co.*, 23 F.3d at 622 ("It is [a court's] duty . . . to look beyond the pleadings and arrange the parties according to their sides in the dispute.").

In order to align properly, the Second Circuit looked to the Supreme Court's above-referenced holding in *Chase Nat'l Bank*, which instructed courts to determine "whether a necessary collision of interests exists." *Id.* at 23 F.3d at 622 (citing *Chase Nat'l Bank*, 314 U.S. at 69). The Supreme Court held that this determination was "not to be determined by mechanical rules. It must be ascertained from the 'principal purpose of the suit' . . . and the 'primary and controlling matter in dispute.'" *Chase Nat'l Bank*, 314 U.S. at 69 (quoting *E. Tenn., Va. & Ga. Co. v. Grayson*, 119 U.S. 240, 244 (1886) and *Merch. Cotton-Press & Storage Co. v. Ins. Co.*, 151 U.S. 368, 385 (1894), respectively).

In elucidating the Supreme Court's holding, the Second Circuit, in *Md. Cas. Co.*, held that the collision of interests test dictates that "courts require the existence of an actual, substantial controversy, or a collision of interests . . . but the conflict may in some cases concern an issue other than the so-called primary issue in dispute." 23 F.3d at 622 (citing, *e.g.*, *U.S.I. Props. Corp. v. M.D. Constr. Co.*, 860 F.2d 1, 4-5 (1st Cir. 1988). "This approach is more flexible because it permits courts deciding whether diversity exists to consider the multiple interests and issues

involved in the litigation." *Id.*

The Southern District of New York, in *Safeskin Corp.*, held that a potential conflict between parties does not pass the collision of interests test since a potential conflict is not, by definition, an actual and present controversy. 1998 WL 832706, at *2.

### b.     The Court Realigns NY&A

Defendant argues that the Court should realign NY&A into a co-plaintiff because Plaintiff and NY&A "each have the same direct corresponding financial stake in the litigation." Def.'s Second Supp. Brief at 1, ECF No. 90. "After considering the multiple interests and issues involved in the litigation," the Court concurs. *Md. Cas. Co.*, 23 F.3d at 622. If Defendant breached the Contract, Defendant does not owe liquidated damages to Plaintiff; the Contract provides any liquidated damages to "the Railroad", which the Contract plainly states is Plaintiff and NY&A *jointly*. Contract § 4. The Contract expresses this unambiguously. *See Myers*, 2011 WL 780128, at *1 ("Where a contract is unambiguous, courts must give effect to the words used."). Under Virginia contract law, the Court is "bound to say that the parties intended what the written instrument plainly declares." *Irwin*, 623 S.E.2d at 441. The "collision of interests" occurs between Defendant and the Railroad, not Defendant and Plaintiff. *See Md. Casualty Co.*, 23 F.3d at 622.

Defendant argues additionally that the cross-claims between Plaintiff and NY&A do not present an actual controversy between those parties. *See* Def.'s Second Suppl. Mem. Supp. Mot. Dismiss 4. Plaintiff and NY&A have since dismissed their cross-claims; thus, no actual or even potential conflicts exist between Plaintiff and NY&A.

Plaintiff and NY&A spent an inordinate amount of time, both in their briefs and during

the Court's evidentiary hearings, on the question of whether the use of "Railroad" was a "boilerplate" term.[4] These parties' implication seemed to be that if Railroad was boilerplate language, the word somehow lost its meaning. Under Virginia contract law, however, "whether the provision and phraseology used were 'boilerplate' or not . . . is quite beside the point . . . . The excuse or justification that [the term] was merely carried over as 'boilerplate' language falls on unsympathetic ears; it is a lame and unworthy contention." *Great Am. Ins. Co. v. Cassell*, No. 86-000763, 1988 WL 626029, at *2 (Va. Cir. Ct. Dec. 14, 1988). Moreover, no party contends the use of Railroad was a mistake: indeed, Plaintiff claims the term was typical. *See, e.g.*, Eaton Test., 76:6-7 ("we put the contract package together using boilerplate templates."), Sept. 28, 2011. "Accordingly, [the term] appears [to be] an integral part of the parties' agreement." *Alarcon v. Alarcon*, No. 121898, 1993 WL 946199, at *3 (Va. Cir. Ct. Aug. 17, 1993). Courts dislike boilerplate language, typically, because the language benefits the drafter (often a large, well-staffed company) against the other party (often a lay-person, legally). In this case, however, the drafter asks the Court to disregard the drafter's own plain language. The Court may not do so.

The Contract, under which Plaintiff's suit is premised, directs liquidated damages to Plaintiff and NY&A jointly. In other words, the Railroad "is the 'true' Plaintiff", not Norfolk Southern Railway Company. *Safeskin Corp.*, 1998 WL 832706, *1. The parties, through the plain language of the Contract, intended this result. The "realities of the record" necessitate, therefore, NY&A's alignment as a co-plaintiff. *Md. Cas. Co.*, 23 F.3d at 623 (quoting *Indianapolis*, 314 U.S. at 69). Because NY&A is a New York company, the suit lacks complete

---

4 For example, at the September 28, 2011 hearing, the term "boilerplate" was mentioned twenty-three times.

diversity. As such, the Court grants Defendant's motion to dismiss the lawsuit due to the Court's lack of subject matter jurisdiction.

### iii. Joint Venture

Besides party-alignment, Defendant argues that the two railroads (Plaintiff and NY&A) were a joint venture as to the Contract. Because NY&A is a New York-based company, Defendant argues, the Court has no subject matter jurisdiction over the matter due to a lack of complete diversity. *See* Def.'s Mem. Supp. Mot. Dismiss 10.

"[F]or the purpose of determining whether diversity jurisdiction exists, unincorporated associations such as joint ventures are citizens of every state in which their members are citizens." *Varlotta Constr. Corp. v. Carla Dev. Corp.*, 886 F. Supp. 315, 317 (E.D.N.Y. 1995) (citing 13B C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3630 (1995)). "Thus, if the plaintiff is the joint venture, complete diversity is absent, and there is no subject matter jurisdiction." *Id.*; *see also Schiavone Constr. Co. v. City of New York*, 99 F.3d 546, 548 (2d Cir. 1996).

#### a. Standard

According to Virginia case-law, specifically *PGI, Inc. v. Rathe Prods., Inc.*, "a joint venture exists where two or more parties enter into a special combination for the purpose of a specific business undertaking, jointly seeking a profit, gain, or other benefit, without any actual partnership or corporate designation." 576 S.E.2d 438, 441 (Va. 2003) (citing *Roark v. Hicks*, 362

S.E.2d 711, 714 (Va. 1987)).[5] "'A joint adventure exists when two or more persons combine a joint business enterprise for their mutual benefit, with an express or implied understanding or agreement that they are to share in the profits or losses of the enterprise, and that each is to have a voice in its control and management.'" *Id.* (quoting *Smith v. Grenadier*, 127 S.E.2d 107, 110 (1962). "Little formality in its formation is required and the parties' conduct, along with other facts and circumstances, will often justify the inference that a joint venture exists." *Weiss v. Cassidy Dev. Corp.*, No. 206766, 2003 WL 1563425, at *3 (Va. Cir. Ct. Feb. 21, 2003) (citing *Smith v. Grenadier*, 127 S.E.2d 107, 111 (Va. 1962)). Moreover, according to the Virginia Code, any partnership, including a joint venture, can be formed "whether or not the persons intend to form a partnership." Va. Code § 50-73.88(A).[6] The Code states additionally that an entity that "receives a share of the profits of a business is presumed to be a partner in the business, unless the profits were received in payment." *Id.* at § 50-73.88(D).

In order to be a joint venture, "[t]he profit accruing must be joint and not several. Otherwise every person, firm or corporation who furnishes materials or supplies in connection with an enterprise might be termed joint venturers, whether or not they had any such intention." *Wells v. Whitaker*, 151 S.E.2d 422, 430 (Va. 1966).

---

5 While a personal relationship is called a "joint adventure, a " 'joint venture' . . . is used in connection with a business relationship." *Wells v. Whitaker*, 151 S.E.2d 422, 430, n.3 (Va. 1966). Apart from party identity, both terms have the same legal meaning and are used interchangeably.

6 Under Virginia case-law, the Court looks first to the Contract; "[t]o the extent that [the Contract] does not address an issue, the [Virginia] law of partnership is applied. If the issue is not addressed by the [Contract or Virginia law of partnership], 'the principles of law and equity' apply." *PGI, Inc.*, 576 S.E.2d at 442.

12

> When the question of whether two or more parties were engaged in a joint enterprise becomes pertinent, such question must be determined as any other factual issue; that is, if the evidence is in conflict, or if reasonable men may differ as to the proper inferences to be drawn from the uncontradicted testimony, a jury question is presented; otherwise, it is a question of law to be determined by the court.

*Painter v. Lingon*, 71 S.E.2d 355, 358 (Va. 1952) (citing, *e.g.*, *Director General v. Pence*, 116 S.E. 351 (Va. 1923). The parties, at the July 22, 2011 hearing, agreed to permit the Court to determine this question.

In Virginia, "[a] partnership may sue and be sued in the name of the partnership." Va. Code § 50-73.97(A).

### b. A Joint Venture was Created by the Contract

As noted, the Contract orders that Plaintiff and NY&A would be referred to as Railroad. Contract Preamble. Moreover, Plaintiff and NY&A share both the *obligation* to transport Defendant's debris and the (monetary) *benefits* of the Contract: revenue that is split according to a separate contract between Plaintiff and NY&A and as well as the ability to gain "some control over the creation of the dimensions of the market, where [Plaintiff and NY&A] are participating as rate maker, rather than say a rate taker." Victor Test., 48:21-24. Plaintiff and NY&A share, additionally, the benefits of the liquidated damages provision.

Plaintiff cites the Southern District of New York for the proposition that the test for intent to form a joint venture is to see "'whether the parties have so joined their property, interest, skills, and risks that their contributions have become one and their commingled properties and interests have been made subject to each others' actions, on the trust and inducement that each would act for their joint benefit.'" Pl.'s Mem. Opp'n Mot. Dismiss 5 (quoting *Kidz Cloz, Inc.*, 320 F. Supp.

13

164, 172 (S.D.N.Y. 2004)). As Plaintiff notes, this holding regards New York law, but, according to Plaintiff's citation of *Witter v. Torbett*, "[t]he rule is substantially the same" in Virginia. *Id.* Plaintiff misapplies the *Witter* holding.

The *Witter* holding, though made by a federal court in Virginia, explicitly regarded New York law, not Virginia law. 604 F. Supp. 298, 302 (W.D. Va. 1984) ("New York was the forum in which these contracts were entered into and thus [case-law] dictate[s] that New York's substantive law is to be applied."). Virginia joint venture law was not determinative in *Witter*.

The parties in the *Wells* holding were, essentially, a producer and a wholesaler: the Atlas Powder Company, which manufactured explosives, and the Whitaker-Atlas Supply Company, which sold those explosives to miners. *Id.* at 426. When an explosion destroyed the Wells' home, the Virginia Court of Appeals held that these companies were not joint venturers. The Virginia Court cites Restatement (Second) Agency § 14J, which states, "[o]ne who receives goods from another for resale to a third person is not thereby the others agent in the transaction." The present case, therefore, is factually-distinct from the *Wells* holding.

Plaintiff and NY&A meet Virginia's definition of joint venture. The companies are (1) two parties, which (2) enter into a special combination for the purpose of a specific business undertaking (transporting Defendant's debris), (3) seeking a profit (4) without any actual partnership or corporate designation. *PGI, Inc.*, 576 S.E.2d at 441.

As noted, the Contract's benefits and obligations are held jointly by Plaintiff and NY&A. In a contract between Plaintiff and NY&A that is outside the bounds of this case, profits were divided; but in the Contract the document at issue before the Court and document by which Plaintiff seeks to sue Defendant the profits are joint. Similarly, in a law firm partnership, profits,

14

bills, and accounts receivable, for example, are joint: when clients pay their bills, they write the check to the law firm, not to the attorney who did the work. The profits are divided according to agreement a later time; this subsequent division does not negate the partnership. Joint ventures do not require profits or losses to be split equally: at the law firm, the junior partner might be entitled to a smaller division of the profits than the senior partner; this, again, does not negate the partnership. Simply because Plaintiff or NY&A receives a larger share of the profits, at the subsequent split, does not negate the joint venture.

At this point, the sole question is whether Plaintiff and NY&A "each [had] a voice in its control and management" of the venture. *Id.* Importantly, little formality in formation of a joint venture is necessary. *See Weiss*, 2003 WL 1563425, at *3. Virginia precedent does not require equal control and management of the operation, nor does it require that one party is able to order the other party to do something; instead, each side simply needs a "voice" in the operation. In the same way, senior law partners may not listen to the ideas of a junior law partner; the senior law partner may tell the junior partner to operate in such a manner and the junior law partner may not listen. These examples, however, would not negate the partnership. Defendant argues NY&A told Plaintiff to remove its cars from NY&A's track; Plaintiff complied. Plaintiff argues NY&A *asked* Plaintiff to remove the cars and Plaintiff agreed. Either way, this occurrence evidences NY&A's "voice" in the operation's management. Moreover, in general, Plaintiff could not transport Defendant's Debris unless NY&A transported it first and NY&A could not remove the Debris on schedule unless Plaintiff provided their railcars, which NY&A "utilized" (*see* Victor Test., 54:18-22), on schedule. The Court finds Plaintiff and NY&A each had a voice in the control and management of the venture. The Court finds, therefore, that the present facts and

circumstances, along with the plain language of the Contract, prove that a joint venture was formed for purposes of the Contract.

Plaintiff and NY&A argue that in finding a joint venture exists, the Court is somehow upending common carrier laws and regulations. The Court, of course, is doing nothing of the kind. The parties negotiated and executed a plainly-written, enforceable contract. Plaintiff seeks to sue Defendant based upon that contract, not upon common carrier laws and regulations. The Court bases this Order upon that contract, not common carrier laws. The Court's holding, therefore, does not affect, in any way, common carrier laws or regulations. Plaintiff and NY&A, moreover, decided to execute the Contract with Defendant; the two other railroad companies that were involved in transporting Defendant's Debris were not parties to the Contract. Those companies could not be considered, legally or factually, part of the joint venture. The Court's holding does not create a joint venture that includes those parties. Plaintiff and NY&A would not have created a joint venture if they had executed a contract that did not, for example, plainly make profits joint. If Plaintiff and NY&A are unhappy with the Court's holding, they have only themselves to blame.

The Court has realigned NY&A as a co-plaintiff; the Court has found additionally that Plaintiff and NY&A constituted a joint venture under the Contract. Because NY&A is a New York company, there is no complete diversity and, therefore, the Court lacks subject matter jurisdiction over this suit. Defendant's Motion to Dismiss is granted.

## B. NY&A's motions; Defendant's Motion for partial Summary Judgment

As the Court does not have subject matter jurisdiction over this suit, the Court denies these three motions, without prejudice, so they may be filed in the proper court.

16

## CONCLUSION

For the foregoing reasons, (1) Defendant's Motion to Dismiss is hereby **GRANTED**; (2) Defendant's Motion for partial Summary Judgment is **DENIED**, without prejudice to renew; (3) New York & Atlantic Railway's Motion to Dismiss is **DENIED**, without prejudice to renew; and (4) New York & Atlantic Railway's Motion to Strike is **DENIED**, without prejudice to renew.

**SO ORDERED.**

_____
Thomas C. Platt, U.S.D.J.

Dated: March  19, 2012
Central Islip, New York